## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Virgil Liptak d/b/a Designed | ) | 03 B 29854 |
| Financial Services, | ) | |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Chapter 11 debtor Virgil Liptak ("Liptak"), a resident of Dallas, Texas, filed this Chapter 11 bankruptcy case in Chicago on July 16, 2003, as a business bankruptcy case involving his sole proprietorship Designed Financial Services, a provider of financial-planning and business-management services. The assets and liabilities regarding this case, however, have no direct links to Liptak's business; his most recent source of income is the interest and dividends from savings and investments, including approximately $100,000 during the two years prior to filing this case and $1800 per month at the time of filing.

The controversy herein stems from the debtor's 1993 divorce from Elizabeth Thornhill ("Thornhill") and the June 11, 2001 judgment she received against him in the District Court of Dallas County in Texas that essentially vacated and amended parts of the December 1993 Agreed Decree of Divorce and Agreement Clarifying Agreed Decree of Divorce. In the original property settlement which he drafted, Liptak received a 35% interest in a partnership, R.E. Colgin I, Ltd., and the right to receive 63.8% of the profits from the same while in active management. He also obtained a right to receive 39% of the first $500,000 in proceeds from a personal-injury lawsuit in which he and Thornhill were co-plaintiffs against Showa Denko at the time of the divorce. By the

time the parties settled and dismissed the lawsuit against Showa Denko in 1995, the divorce decree

and property settlement were already final, and Liptak received $195,000 of the proceeds of that

lawsuit in accordance with the property-division stipulation of the divorce decree. Liptak continued

to provide financial and management services for R.E. Colgin I, Ltd. until Thornhill as the majority

interest holder terminated his employment with the business and sued him in the 95th Judicial District

of Texas to enforce the termination provision of his employment contract and to require the turnover

of business documents.

A variety of state-court litigation involving both the property-division decree from the

divorce and Liptak's work for R.E. Colgin I, Ltd. ensued over the next seven years in state and

federal courts, most of which was not clearly delineated, explained, or documented for this Court

by either party. Apparently, though, Thornhill ultimately prevailed in most if not all of this litigation.

Liptak, not being as fortunate, according to the assertions of Thornhill's attorney, resorted to suing

every person to whom he could attribute fault for his litigation losses – state-court judges, law firms,

Thornhill's next husband, a sheriff, a court reporter, and a district court clerk – with the end result

being that he was deemed a vexatious litigant under Texas's statutory law. *See* Tex. Civ. Prac. &

Rem. Code Ann. § 11.054 (Vernon Supp. 2002); *Liptak v. Thornhill*, 2002 WL 31730926, at *3

(Tex. App. 2002). Liptak did not rebut or deny any of these assertions.

The one prior lawsuit and resulting judgment clearly presented to this Court was Thornhill's

aforementioned "bill of review" action, which alleged that Liptak fraudulently withheld information

and assets from her during their divorce proceeding. This judgment, which was ultimately successful

in attacking their agreed 1993 property settlement, comprises virtually all of the debt in this chapter

11 case and therefore would present the centerpiece for dispute in this bankruptcy case. Based on

2

the jury's answer to various questions, the judge presiding over the "bill of review" action redistributed portions of the their marital estate by awarding Thornhill (1) the $195,000 plus prejudgment interest for the settlement proceeds from their joint lawsuit against Showa Denko; (2) the 35% interest in Richard E. Colgin I, Ltd.; (3) $1,100,000 in exemplary damages; (4) attorneys' fees for all present and future stages of the bill-of-review lawsuit in the amount of $303,000; and (5) courts costs in the amount of $2043.17. The June 11, 2001 judgment explicitly voided and superseded portions of the December 1993 "Agreed Decree of Divorce and Agreement Clarifying Agreed Decree of Divorce" and additionally dismissed with prejudice Liptak's counterclaims and third-party claims against Elizabeth Thornhill, Kerry Thornhill, and Richard E. Colgin Company. The Texas Court of Appeals subsequently affirmed the judgment, which is now awaiting a decision concerning whether discretionary review by the Texas Supreme Court will proceed.

Given the nature and extent of the litigation occurring between the two parties, Thornhill not surprisingly had great difficulty collecting her judgment during the two and a half years following her court victory, even though Liptak never actually posted an appeal bond to stay enforcement and collection of the June 2001 judgment. Thornhill proceeded with her collection attempts by initiating various garnishment and foreign-money-judgment collection lawsuits against the third parties holding Liptak's accounts. Thornhill successfully collected $2014.28 through a garnishment suit against World Savings & Loan Association in Dallas County; froze $390,000 that is currently being held by the district court clerk for Dallas County; and also sued the Vanguard Group in a garnishment suit in Pennsylvania to recover one of Liptak's accounts worth approximately $1,774,000 to $1,784,000.

Liptak managed to stall two of the pending collection proceedings by filing the instant

3

chapter 11 bankruptcy case with its concomitant automatic-stay protections in § 362(a), but only after failing in his effort to obtain an emergency stay of Thornhill's Pennsylvania action against the Vanguard Group by arguing to the 68th Judicial District of Texas that it had an obligation to reopen the Showa Denko lawsuit to protect its award of $195,000 to Liptak against Showa Denko (not against Thornhill). Liptak then tried to get this same argument in front of the federal court administering his bankruptcy case by filing a notice of removal for the Showa Denko lawsuit and then asking a bankruptcy judge for the federal judicial district embracing the 68th Judicial District of Texas to transfer it as an "adversary proceeding"[1] to the Northern District of Illinois where his bankruptcy case was pending. On September 15, 2003, the bankruptcy judge for the U.S. Bankruptcy Court for the Northern District of Texas remanded[2] the civil action back to the Texas state court where it had been dismissed eight years earlier rather than transfer the venue of the "adversary proceeding" under 28 U.S.C. § 1412 to the U.S. Bankruptcy Court for the Northern District of Illinois. As part of his bankruptcy case, Liptak filed the exact same lawsuit as Adversary Proceeding # 03-03732 against Thornhill in this Chapter 11 case. The ensuing confusion over the Texas bankruptcy court's remand of the same basic lawsuit has produced cross motions for dismissal or for partial summary judgment on Adversary Proceeding # 03-03732.

Liptak filed another notice of removal in the U.S. District Court for the Northern District of Texas for his pending lawsuit in the 255th Judicial District of Texas against Mark Stewart, Sheriff Jim Bowles, and Bank One. The status of this adversary proceeding is not known to the Court at this time, but it has no separate docket entry or adversary number indicating that removal and transfer

---

[1]28 U.S.C. § 1334(b); Fed. R. Bankr. Pro. 7001.

[2]28 U.S.C. § 1452(b).

4

were effectively accomplished.

Thornhill filed a motion to dismiss Liptak's chapter 11 bankruptcy case for "cause" pursuant to 11 U.S.C. § 1112(b), alleging that Liptak did not file this case in good faith as required by law. She also requests dismissal or transfer of the case for improper and inconvenient venue under 28 U.S.C. § 1408(1) and Bankruptcy Rule 1014(a). The Court heard three hours of evidence during the afternoon of November 19, 2003, on Thornhill's motion to dismiss for cause or to transfer the bankruptcy case to the more convenient forum of the Northern District of Texas. Only Liptak presented evidence during this hearing on the contested motion,[3] with Thornhill's attorney and the U.S. Trustee being satisfied to meet their burden of proof using only their legal arguments based on Liptak's evidence as well as his Chapter 11 bankruptcy petition and schedules and records from the Texas U.S. Bankruptcy Court. An accurate picture of the various Texas legal proceedings was difficult to grasp in no small part because some of Liptak's evidence presented incomplete information. For instance, he offered evidence to show that Thornhill's bill of review action was originally dismissed on January 29, 1996, for failure to present a *prima facie* case of what would have been a meritorious claim or defense in the divorce proceeding; however, Thornhill subsequently prevailed as evidenced by the June 11, 2001 bill of review judgment.

In considering the totality of the circumstances and all of the evidence and arguments presented at the hearing, the Court believes that this is the extraordinary situation where the creditor has met her burden of proof on a motion to dismiss by using the debtor's evidence, verbal and written admissions, bankruptcy schedules, and statement of financial affairs to show that the debtor

---

[3]Liptak offered as evidence exhibits A through T, and the Court admitted exhibits A, D, E, F, G, I, J, K, M, N, Q, and R.

failed to meet the good-faith filing requirement for chapter 11 bankruptcy cases.

## Discussion and Conclusions of Law

Even though § 1112(b) permits involuntary dismissal for an enumerated, nonexclusive list

of ten grounds, its general authority to dismiss chapter 11 bankruptcy cases "for cause" has permitted

the development of common-law grounds for dismissal. Accordingly, federal courts have required

a good-faith filing requirement for debtors opposing dismissal "for cause" under § 1112(b). *In re*

*International Oriental Rug Center*, 165 B.R. 436, 442 (Bankr. N.D. Ill. 1994); *In re Marsch*, 36 F.3d

825, 828 (9th Cir. 1994) (citing *In re N.R. Guaranteed Retirement*, 112 B.R. 263, 270 (Bankr. N.D.

Ill. 1990)); *In re N.R. Guaranteed Retirement*, 112 B.R. 263, 270-71, 279 (Bankr. N.D. Ill. 1990)

(quoting *In re Madison Hotel Associates*, 749 F.2d 410, 426 (1984)); *In re Gleason*, 2002 WL

570647, at *1 (N.D. Ill. 2002); *Matter of Love*, 957 F.2d 1350, 1354 (7th Cir. 1992) (same for

Chapter 13 case). The moving party in interest bears the burden of proof by a preponderance of the

evidence on such a motion to dismiss. *In re International Oriental Rug Center*, 165 B.R. 436, 443

(Bankr. N.D. Ill. 1994); *In re Gleason*, 2002 WL 570647, at *1 (N.D. Ill. 2002); *Matter of*

*Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994); *cf. In re McNichols*, 258 B.R. 892, 902

(Bankr. N.D. Ill. 2001) (in Chapter 13 case, creditor's burden of proof for showing case not filed in

good faith is higher than for showing plan not filed in good faith); *Matter of Love*, 957 F.2d 1350,

1355-56 (7th Cir. 1992) (same conclusion, but also declining to impose "extraordinary circumstances

requirement" for such a dismissal). *But see In re Leavitt*, 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997),

*affirmed*, 171 F.3d 1219 (9th Cir. 1999) (debtor has burden of proof to show case filed in good faith).

To make the requisite showing, the movant need not show, though it would be relevant, that

the debtor had any sort of fraudulent or malicious intent or scheme in mind when filing;

6

"malfeasance is not a prerequisite to bad faith." *In re Leavitt*, 209 B.R. 935, 940-41 (B.A.P. 9th Cir. 1997), *affirmed*, 171 F.3d 1219 (9th Cir. 1999); *cf. Matter of Love*, 957 F.2d 1350, 1360-61 (7th Cir. 1992) (same for Chapter 13 case). Because one of the purposes of § 1112(b) is to short circuit the plan-confirmation process when it would be useless or improper, a movant can successfully request dismissal even if the debtor has not submitted a plan or run out of time to do so exclusively. *Matter of Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994).

What the movant must positively demonstrate to show a lack of good faith in filing has been stated in a variety of ways, and courts have noted that focusing on terms such as good or bad faith in filing is misleading to some degree, as the question is really whether the debtor has presented a legitimate reorganizational objective within the scope of the Bankruptcy Code or rather has presented "tactical reasons unrelated to reorganization," *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *see In re N.R. Guaranteed Retirement*, 112 B.R. 263, 271 (Bankr. N.D. Ill. 1990). Generally, the Court must consider the totality of circumstances surrounding a variety of objective and subjective factors, *see, e.g., In re Stump*, 280 B.R. 208, 214 n.2 (Bankr. S.D. Ohio 2002); *but see In re International Oriental Rug Center*, 165 B.R. 436, 442-43 (Bankr. N.D. Ill. 1994) (saying subjective intent not relevant but then saying an improper purpose for filing would constitute bad faith), and then determine whether, in light of the spirit of the Bankruptcy Code, the filing is fundamentally fair to creditors attempting to exercise their collection rights. *Matter of Love*, 957 F.2d 1350, 1355, 1357, 1359 (7th Cir. 1992) (chapter 13 dismissal under § 1307(c)); *In re Leavitt*, 209 B.R. 935, 939-41 (B.A.P. 9th Cir. 1997), *affirmed*, 171 F.3d 1219 (9th Cir. 1999).[4] Obviously, this formulation does

---

[4]The Seventh Circuit's case law concerning dismissal for lack of good faith in Chapter 13 cases under § 1307 is also relevant because an *individual* Chapter 11 case is really just a debtor-controlled alternative to a Chapter 13 case, and the individual aspects of this Chapter 11 case predominate over any business aspects that may be

not give bankruptcy courts much guidance or provide would-be debtors with a uniform idea of how

to structure their pre-filing conduct. Several opinions have fortunately identified recurring patterns

that exemplify situations strongly suggesting that a chapter 11 case has been filed in bad faith.

This individual chapter 11, though, does not call for the usual analysis that bankruptcy courts

perform when determining whether a true *business* has filed a chapter 11 petition in good faith

because it has a need to restructure debt in order to survive. Usually this analysis looks at general

considerations such as those recognized by Judge Schmetterer in In re International Oriental Rug

Center, 165 B.R. 436, 442 (Bankr. N.D. Ill. 1994):

> Chapter 11 was designed by Congress to prevent waste and reduction in assets that
> result from unnecessary liquidation. Congress meant to encourage financial
> restructuring and to re-establish efficient business operations with the goals of
> permitting greater payments to creditors than could otherwise be made, while also
> preserving jobs and shareholders' interest. *See, e.g., In re HBA East, Inc.,* 87 B.R.
> 248, 259 (Bankr.E.D.N.Y.1988), citing H.R. Rep. No. 595, 95th Cong., 1st Sess. at
> 220-21 (1977), *reprinted in* 1978 U.S.C.C.A.N. pp. 5787, 5963, 6179. The good faith
> standard is the bankruptcy court's equitable mechanism for assuring that a Chapter
> 11 case has at least the potential to serve those purposes.

Id. (citing In re Schlangen, 91 B.R. 834, 837 (Bankr. N.D. Ill. 1988)). Thus, in International Oriental

Rug for instance, Judge Schmetterer found that the movants did not meet their burden of proof on

the lack-of-good-faith issue in part because the "[d]ebtor was a real business employing sales people

and selling products." Id. at 443. Liptak's discontinuance of Designed Financial Services, though,

does not affect employees and shareholders and will not serve the purpose of paying creditors a

---

present here. *Cf. Matter of Love,* 957 F.2d 1350, 1356 (7ᵗʰ Cir. 1992) ("[T]he good faith analyses differ under
Chapter 11 and Chapter 13 because businesses and individuals are obviously different. *Id.* Indeed, as a consequence
of this difference between individuals and businesses, objective futility seems meaningless in the Chapter 13 context.
Objective futility in the Chapter 11 context focuses on whether a business is capable of surviving after
reorganization. . . . . This is not an issue in an individual bankruptcy filed under Chapter 13 because, ordinarily, an
*individual*'s survival is not related to what happens in the Chapter 13 proceeding.") *with In re N.R. Guaranteed
Retirement,* 112 B.R. 263, 273 (Bankr. N.D. Ill. 1990) ("only if the debtor has the clear ability to *survive* without
bankruptcy court protection") (emphasis added).

greater amount than they would recover had no bankruptcy protection been available. The debts in his chapter 11 case do not stem from his conduct regarding this business, and his cessation of operations appear to be the result of his conscious choice to use his time and energy to pursue (as a *pro se* litigant) every conceivable avenue of relief to undo Thornhill's 2001 legal victory, not the result of any creditor action that is directly or conclusively preventing him from providing financial and management services to clients.

On the other hand, Liptak does not fit the most typical scenario for individuals who file (primarily Chapter 7 and 13) bankruptcy cases without good faith by failing to file accurate (or any) schedules and statements of affairs, not appearing at the meeting of creditors or scheduled court hearings, not sending in plan payments, proposing multiple unconfirmable payment plans, concealing assets, and/or filing multiple serial cases after dismissal. *In re McNichols*, 258 B.R. 892, 902 (Bankr. N.D. Ill. 2001); *In re N.R. Guaranteed Retirement*, 112 B.R. 263, 276-77 (Bankr. N.D. Ill. 1990) (citing *In re Metz*, 820 F.2d 1495, 1497 (9th Cir. 1987)); *e.g.*, *Matter of Love*, 957 F.2d 1350, 1352-53, 1357-59 (7th Cir. 1992).

In spite of these analytical difficulties, other identified tests for good or bad faith can be sensibly applied to the current situation. Four standard scenarios exemplifying a Chapter 11 case being filed without good faith were discussed by Judge Wedoff in *In re Guaranteed Retirement*, 112 B.R. 263 (Bankr. N.D. Ill. 1990); two of these are particularly useful here. The first focuses on the need for a bankruptcy case in light of the debtor's financial condition and the type of assets available for satisfying judgments; the second focuses on the case's effect on creditors' nonbankruptcy collection rights and whether it is merely being used as a tactic to delay pursuit of these rights

9

without any offsetting benefits to the creditor body. The Court will address each issue.[5]

### A. Liptak's Need for Bankruptcy Relief and Ability to Satisfy Judgments

The general test for determining whether a debtor has a need for filing a Chapter 11 case that

is legitimate enough to justify the impact on a judgment creditor's rights has been stated as follows:

> "[A] Chapter 11 filing is in good faith and may be used to replace an appeal bond if
> the judgment against the debtor is so large that the debtor faces severe disruption of
> his business if enforcement of the judgment is not stayed. However, if the debtor has
> the ability to satisfy the judgment from non-business assets, then it is bad faith to
> attempt to use the bankruptcy laws to appeal without posting a bond." . . . The
> timing of any bankruptcy filing may be relevant to determining whether the debtor
> acted to delay creditors unnecessarily . . . , but there is nothing improper in a debtor's
> thwarting state court collection proceedings by filing a Chapter 11 petition, as long
> as reorganization is both needed and feasible. *See In re McStay*, 82 B.R. 763, 768
> (Bankr. E.D. Pa. 1988).

*In re N.R. Guaranteed Retirement*, 112 B.R. 263, 272-73 & n.7 (Bankr. N.D. Ill. 1990) (quoting *In*

*re Holm*, 75 B.R. 86, 87 (Bankr. N.D. Cal. 1987)); *see also In re Marsch*, 36 F.3d 825, 828-29 (9th

Cir. 1994); *In re Gleason*, 2002 WL 570647, at *2 (N.D. Ill. 2002). The test is whether the debtor

has a business justification for thwarting a judgment creditor's collection activity and forcing them

to accept other (possibly reduced) future payment rights under a reorganization plan in lieu of assets

crucial to operating the business. This justification does not exist if the debtor could have satisfied

a judgment with funds and savings that were not being used to operate a business.

Liptak contends that bankruptcy relief is necessary and appropriate here because Thornhill

has continued to sue him repeatedly on the same cause of action, thereby distracting him to the point

where the litigation is disruptive to his operation of Designed Financial Services, and because she

---

[5]The other two focus on the so-called "new debtor syndrome" and a shell company's inability to reorganize
under any type of plan. *See generally In re N.R. Guaranteed Retirement*, 112 B.R. 263, 273-76 (Bankr. N.D. Ill.
1990).

will do so in the future. Additionally, the garnishment actions against the holders of his various financial accounts are threatening to deprive him of the funds that he claims are his "business assets" necessary for him to earn a living. Finally, he argues that his use of Chapter 11 is legitimate because its claim-objection procedure will allow him to finally receive a fair trial for his long-standing dispute with Thornhill, which is allegedly impossible to obtain in Texas; similarly, the bankruptcy case will provide a fairer forum for bringing as adversary proceedings various noncore actions against various individuals in Texas.

1. Liptak's Financial Condition and Purported Need to Reduce his Debt Load

As a legitimate purpose for this Chapter 11, Liptak argued that his debt load was at very least reduced from $63 million to $2 million once the claims bar date passed, *see* Bankruptcy Rule 3003(c), with only $2.1 million in proofs of claim being filed.

A review of Liptak's chapter 11 bankruptcy petition reveals his and Designed Financial Services' financial status as follows:

Liptak holds at least four financial accounts with funds totaling approximately $4,089,000, the largest single one for $2,160,332 in Chicago forming the asserted basis for appropriate venue in the Northern District of Illinois. Liptak lists his total ascertainable assets, including all real and personal property, at $6,182,224 and his total estimated assets, including those of unknown value, at over $10,000,000.

Liptak lists four disputed debts totaling $63,131,873. Three of the four debts are somehow tied to Thornhill: one for $30,866,667 allegedly owed directly to Thornhill and two for $32,254,334 owed to companies owned and controlled primarily by Thornhill, Richard E. Colgin Co. and Richard E. Colgin I, Ltd. The fourth listed debt does not fall far from the Liptak-Thornhill dispute. It is a

11

debt of $10,872 owed to the law firm of Bourland Kirkman for legal services rendered in litigating

claims made by and against Thornhill in various civil proceedings in Texas.

The filed proofs of claim do not come anywhere near $63,131,873. Other than the proof of

claim pertaining to the June 11, 2001 judgment now totaling $2,054,947.80 (when all costs,

attorneys' fees, and post-judgment interest are added), Thornhill has not filed a proof of claim for

any other judgment or debt; nor have her two closely held Colgin companies filed proofs of claim.

Indeed, the claims Liptak lists at $30,866,667 and $32,254,334 are not based on any judgment,

invoice, or lawsuit currently pending against him. They are based entirely on Liptak's oral testimony

that he believes that his wife and her closely held companies will sue him for those amounts in the

future because they have sued him or threatened to sue him on numerous past occasions dating back

to 1995. The scheduled claims purportedly for $30,866,667 and $32,254,334 are Liptak's only basis

for even hinting that he may be insolvent. The Court finds that even if Liptak's subjective belief that

he has disputed debts for these amounts is sincere, his testimony in this regard is objectively

unreasonable and gives it no weight. Why Thornhill would risk filing a proof of claim for only

$2,043,947.80 when she and her companies allegedly have a right to ultimately collect over thirty

times that amount is baffling. If they eventually do resue Liptak for prepetition conduct, the doctrine

of judicial estoppel, might serve Liptak well. Until then, the Court finds that Liptak has no *bona fide*

claim to insolvency. The only other two proofs of claim were Bourland Kirkman's for $10,872 and

the IRS's for $60,784, which Liptak had not scheduled as a debt, bringing the total of claims filed

before the claims bar date to $2,126,603.57. Liptak holds more than this amount in just one of his

four financial accounts.

These facts also demonstrate that this case is predominantly a two-party dispute between

12

Liptak and Thornhill. The other two creditors are *de minimis* by comparison, and the debt to the law

firm of Bourland Kirkman is a product of the legal expenses Liptak incurred to battle Thornhill.

Even the phantom debts owed to the Colgin companies, which Liptak scheduled in excess of

$32,000,000, would be debts that do not stray an inch from the core Liptak-Thornhill controversy,

since Thornhill controls both of these companies.

It is true that insolvency is not a requirement for filing a bankruptcy case under any chapter.

*In re International Oriental Rug Center*, 165 B.R. 436, 442, 444 (Bankr. N.D. Ill. 1994). That said,

solvency is a factor to consider in determining whether a debtor has filed in good faith because of

his genuine need to preserve the going-concern value of a business. The number of creditors

involved in a bankruptcy case, while not by any means dispositive, is also a relevant consideration.

That is, the more that the bankruptcy case appears to be a forum-shopping attempt for what is largely

a two-party dispute, the less the debtor has a need for the type of bankruptcy relief contemplated by

the Bankruptcy Code. *In re International Oriental Rug Center*, 165 B.R. 436, 443 (Bankr. N.D. Ill.

1994) (citing *In re Schlangen*, 91 B.R. 834, 837 (Bankr. N.D. Ill. 1988)).

   2. Liptak's Need to Halt Garnishment Action, Preserve "Business Assets," and Jumpstart
                          "Designed Financial Services"

Liptak's contention that he is in need of bankruptcy relief because Thornhill has sued him

over and over again for eight years on the same cause of action fails to comprehend that exact nature

of what a garnishment action or a suit to collect a money judgment in a foreign jurisdiction really

is. Supplementary actions to garnish are in fact suits against third parties owing debts to or holding

accounts for an unwilling primary judgment debtor. They are legitimate legal remedies available to

creditors and as such do not constitute harassment unless abused; no abuse is discernible from the

13

record in this case. The garnishment and foreign judgment proceedings that Liptak labels as recurring lawsuits for the same alleged wrong are the result of Thornhill's continuing efforts to collect a debt from third parties owing money to Liptak. Liptak, of course, claims that this underlying debt is the result of a civil proceeding ridden with legal errors. Liptak may well be correct about the legal errors that resulted in his liability to Thornhill. However, as discussed below, the *Rooker-Feldman* doctrine requires that those errors be corrected, if at all, through the Texas appellate hierarchy (and then by the U.S. Supreme Court if a federal issue was presented to its highest court), not by a federal court of original jurisdiction.

As for the so-called "business assets" allegedly needed for reorganization, they are not machinery, inventory, equipment, real estate, or other traditional types of capital assets; they are liquid assets such as money-market accounts. No evidence suggests that the $2 million Thornhill seeks to collect is absolutely necessary for Liptak to provide business-turnaround advice to potential clients or that he uses his own funds to rehabilitate companies. The Court thinks that "business assets" are readily distinguishable from the products of "business assets," and that only the former are relevant when the issue is whether the debtor has used a bankruptcy case in good faith to stall a creditor's levy on assets needed for reorganization. *See Marsh*, at 828-29. A debtor cannot merely label funds he does not want applied to satisfy a single judgment as "business assets" in need of preservation, thereby justifying bankruptcy relief; he must show that the funds or assets are needed to actually operate a business producing goods or services. Otherwise, a debtor could simply evade the rule by investing his money in return for interest and/or dividends and then claiming that he was in the "business of investing" and needed bankruptcy protection to preserve his "business assets" -- even though his money could readily be applied outside of bankruptcy to reduce creditors' claims.

14

Liptak argues that reorganization is appropriate under Chapter 11 of the Bankruptcy Code because Thornhill's continued efforts to collect her judgment by means of garnishment actions in various jurisdictions are consuming so much of his time and energy that he can no longer operate his turnaround and financial counseling business and thus faces losing his business's goodwill. Normally a Chapter 11 case is available to help preserve goodwill, as Congress intended, when a debtor's insolvency is about to cause its cessation. Liptak, once again, does not appear to have a bona fide claim to insolvency. Moreover, maximizing the going-concern value of a bankruptcy debtor by delaying creditors is a valid use of the Bankruptcy Code only when the indebtedness itself *causes* the debtor to face the loss of the going-concern value of his business. A desire to avoid paying a disputed debt that one is capable of satisfying is not sufficient to trigger this objective, especially if such desire unreasonably consumes the debtor to the point that he can no longer concentrate on running his sole proprietorship. The Court believes that Liptak would be fully capable of successfully operating his turnaround business if he simply chose to do so instead of conceiving yet another tactic to avoid paying the June 11, 2001 Texas state-court judgment. He has not shown inability to run his business; he has shown an unwillingness to pay his debt to Thornhill, which he is able to pay with available liquid assets. Moreover, the dispute over the debt to Thornhill has not at all been clearly linked to Liptak's current or potential clients' willingness to pay for the services of his sole proprietorship, Designed Financial Services. That is, why would they choose not to contract for debtor Liptak's turnaround advice solely because his ex-wife continues to sue him to collect her judgment? The real problem that Liptak fears is that he will no longer be able to earn interest on his accounts if Thornhill successfully completes her garnishment actions. An individual person's business endeavor consisting purely of earning interest is not the type of "business"

15

Congress had in mind when it designed Chapter 11 of the Bankruptcy Code. The Court finds that the purported disruption of Designed Financial Services and any related loss of its goodwill is a pretextual purpose for the filing of this chapter 11 case.

3. Liptak's Need for Central Forum to Achieve a Global Settlement of All Pending Litigation

Liptak relies on *In re Hall*, 304 F.3d 743 (7th Cir. 2002), for the proposition that his Chapter 11 filing is in good faith because it attempts to bring into one forum a multiplicity of scattered lawsuits and then to achieve a simplified "global settlement" concerning all such litigation. *See id.* at 746-47.

*Hall* was comparatively a more complex case in which the individual debtor had a conceivable right to be in a chapter 11 bankruptcy case; thus, the Seventh Circuit, with some hesitation, found the bankruptcy court's factual finding that the debtor Hall had met the good-faith filing requirement to be not clearly erroneous. *See id.* at 746-47. In *Hall*, the debtor owned all interests in a corporation that was simultaneously a chapter 11 debtor, and both debtors were co-plaintiffs in a pending lawsuit against the company that sold the stock in the corporate debtor to Hall. The corporate debtor was in trouble because it was the subject of a class-action lawsuit concerning its liability for the manufacture of furnaces, it had pending lawsuits against 24 insurance companies regarding its coverage for this alleged liability, and an insurance settlement that was key to settling the former suit fell through during the pendency of the corporate Chapter 11 case. *See id.* at 745, 747. Most significantly, though, Hall had obtained a loan of $7.5 million to purchase the stock of the corporate debtor, and both Hall and the corporation were liable for the purchase-price debt. For two reasons the Seventh Circuit found that Hall's filing of his Chapter 11 petition could have met the good-faith filing requirement, even though Hall had made false statements during his bankruptcy

16

case. First, the concurrent chapter 11 bankruptcy cases could have been a legitimate attempt to reach a "global settlement" by bringing into one court all of the aforementioned litigation tied to both debtors. *In re Hall*, 304 F.3d 743, 746-47 (7th Cir. 2002). Second, Hall's actual solvency or insolvency was not at all readily apparent. His debt consisted largely of his contingent guarantor liability, the value of which was intimately tied to the resolution of the corporate chapter 11 case. Similarly, his primary asset was the corporate stock, the value of which was also dependant upon the resolution of multiple lawsuits in which the corporate debtor was both a plaintiff and defendant. *In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002). Furthermore, the Seventh Circuit held that the lower court did not abuse its discretion in dismissing Hall's Chapter 11 case without prejudice, monetary sanctions, or attorneys' fees. *See id.* at 744-45, 749.

*Hall* does not help the debtor in this case, as the decision was primarily concerned with reviewing factual rather than purely legal issues, and the facts in this case are substantially different. Liptak does not hold as his primary asset a corporation with a simultaneously pending Chapter 11 case involving a class-action product-liability claim, 24 related lawsuits against insurance companies, and a lawsuit against the company that sold him the stock in the corporate debtor. He has not guaranteed the purchase of a simultaneously pending chapter 11 debtor. Instead, he is clearly solvent. He has no real need to bring voluminous litigation to one federal forum in hopes of a "global settlement." As discussed above, most of the legal controversy in this case is reducible to the common denominator of the disputed 1993 property-division decree between Liptak and Thornhill. The eight years of state-court litigation involving these two (while once voluminous) has for all practical purposes concluded in Texas, and the only legal actions even pending now are Thornhill's post-judgment garnishment actions against the third parties holding Liptak's assets.

17

There is no "global settlement" to achieve at this point; the bankruptcy case is just a blatant attempt

to forestall a single creditor's post-judgment collection proceedings, to collaterally attack the same

judgment in violation of the *Rooker-Feldman* doctrine, *see infra,* and to shop for a more favorable

forum for suing Texas state or county officials for alleged misconduct.

### 4. Liptak's Need to Marshal Assets for His Bankruptcy Estate by Prosecuting Lawsuits Against Third Parties in the Bankruptcy-Case Forum

Debtor-in-possession Liptak offered as another legitimate purpose for this chapter 11 case

the marshaling of assets to increase the value of his bankruptcy estate for creditors by means of

bringing counterclaims against Thornhill and related lawsuits against various third parties. More

specifically, Liptak intends to assert claims against various Texas individuals who are not creditors

in his case, including a sheriff who failed to deliver to him a certain bill of sale, by means of bringing

"noncore" adversary proceedings that are "related to" his bankruptcy case.  11 U.S.C. § 157(c).

Normally, such litigation has potential to brings funds into the bankruptcy estate, thereby

increasing the dividend that creditors might receive from the otherwise insolvent debtor on account

of its claim. The particular facts and circumstances of this case, however, indicate that the ultimate

and sole purpose of bringing any such noncore proceedings is to receive an alternative and possibly

more favorable forum to the state and federal courts in Texas.  If Liptak successfully recovered

money from his asserted noncore civil actions, Thornhill, by far the primary creditor in this case,

would receive no greater dividend than if Liptak were unsuccessful; that is, because Liptak is

actually solvent, the marshaling of assets by the bankruptcy estate is not intended for the benefit of

creditors but is rather intended for the forum-shopping advantages that may accrue in favor of the

debtor. The litigation of Liptak's alleged civil rights claims as non-core adversary proceedings, then,

18

would not benefit his creditors and would only serve his forum-shopping needs. The Bankruptcy Code, as a limited-purpose statute, is not designed to provide relief in this scenario, regardless of the merit of Liptak's claims to abuse by the judicial system in Texas.

The preference and fraudulent-transfer actions that Liptak purportedly intends to bring as counterclaims against Thornhill appear to be facially meritless and as such are sham justifications for the existence of this case. More specifically, to recover a preference or a constructively fraudulent transfer, both types of actions require some type of insolvency during that time period, *see id.*, and Liptak has no *bona fide* claim to insolvency. Similarly, a successful preference action would require that Thornhill would have received more than she would have in a hypothetical chapter 7 liquidation case, but in a hypothetical chapter 7 liquidation for the present scenario, a creditor of a fully solvent debtor would have been paid in full anyway. *See* 11 U.S.C. § § 547(b)(5), 726(a). Finally, in an action to recover a factually fraudulent transfer to Thornhill under § 548(a)(1)(A) – the only other type of action in those sections – Liptak would have to prove that he, the *debtor*, made a transfer with the intent to hinder, delay, or defraud a creditor. Thus, he would be saying that he made a transfer of money to Thornhill with the intent to hinder her collection action or to defraud her – an unlikely and illogical type of avoidance action for him to bring as debtor-in-possession.

## B. This Chapter 11's Effect on Primary Creditor Thornhill's Legal Rights and Liptak's Overriding Purpose for Filing This Case

A second test for determining whether a debtor has filed a Chapter 11 case in good faith focuses on the Bankruptcy Code's effect on a judgment creditor's nonbankruptcy collection rights and the debtor's motive for impeding these rights. If the debtor's only purpose for filing the case is

to delay (or defeat) a single judgment creditor, and the case has little or no ability to benefit the

creditor body as a whole, then the debtor has not filed the Chapter 11 in good faith. *See In re N.R.*

*Guaranteed Retirement*, 112 B.R. 263, 276-77 (Bankr. N.D. Ill. 1990); *cf. In re Marsch*, 36 F.3d 825,

828 (9th Cir. 1994); *Matter of Love*, 957 F.2d 1350, 1357-59 (7th Cir. 1992) (affirming Chapter 13

dismissal for lack of good faith when debtor's motive was to avoid payment to a single primary

creditor, the IRS, by filing petition shortly after creditor commenced garnishment); *In re Leavitt*, 209

B.R. 935, 940 (B.A.P. 9th Cir. 1997), *affirmed*, 171 F.3d 1219 (9th Cir. 1999) ("[B]ad faith exists

where the debtor filed a petition only with the intention to defeat state court litigation. *In re*

*Chinichian*, 784 F.2d 1440, 1445-46 (9th Cir. 1986)."); *In re International Oriental Rug Center*, 165

B.R. 436, 443 (Bankr. N.D. Ill. 1994); *In re Stump*, 280 B.R. 208, 214 n.2 (Bankr. S.D. Ohio 2002)

(lack of good faith in filing a Chapter 7 case).[6] *But see In re Gleason*, 2002 WL 570647, at \*2 (N.D.

Ill. 2002) (stating that number of creditors is irrelevant to this inquiry). Both a debtor's pre-filing

and postfiling delays can bear upon this finding, though post-filing dilatory tactics (which are not

---

[6]Identified factors for determining whether a Chapter 7 case was filed in good faith are substantially similar
to those for this Chapter 11 case. For example, the following list of considerations overlap with those identified in
the Chapter 7 *Stump* decision:

    1. The debtor has reduced the creditor body to a single creditor immediately before filing; . . .
    3. There is an intent to avoid payment of a large single debt that has been reduced to judgment;
    4. The debtor did not try to repay; . . .
    6. The debtor has sufficient resources to pay debts; . . .
    11. The debtor showed a pattern to evade a single major creditor;
    12. The debtor failed to make full disclosure;
    13. The debts are modest in relation to assets and income;
    14. There are multiple bankruptcy filings or other procedural "gymnastics."

*In re Stump*, 280 B.R. 208, 214 n.2 (Bankr. S.D. Ohio 2002) (quoting *In re Spagnolia*, 199 B.R. 362, 365 (Bankr.
W.D. Ky. 1995). Concerning factor number twelve, Liptak has failed to fully disclose the extent to which adverse
decisions were rendered against him in the state- and federal-court Texas litigation on various issues he decides to re-
wrap and re-present to this Court in contravention of the *Rooker-Feldman* doctrine. Concerning factor number
fourteen, the awkward (but technically permissible) legal maneuvers needed to remove and transfer purely local legal
disputes with county officers in Texas to the U.S. District Court for the Northern District of Illinois could be
construed as "procedural 'gymnastics.'"

really at issue in this case) can constitute "cause" for dismissal all by itself under § 1112(b)(3). *See In re N.R. Guaranteed Retirement*, 112 B.R. 263, 277 (Bankr. N.D. Ill. 1990); *Matter of Love*, 957 F.2d 1350, 1356, 1360 (7th Cir. 1992) (in Chapter 13 case, bad-faith motive for filing can be inferred from both pre-petition and post-petition conduct).

As far as Liptak's motive in filing this case and its anticipated effect on his creditors' rights are concerned, he admits that he intends to attempt to discharge Thornhill's debt without any payment at all from his bankruptcy estate by objecting to the claim under § 502(b) of the Bankruptcy Code. The Court believes that Liptak's overriding purpose for filing this bankruptcy case is to use this statutory device as a means to obtain another forum for retrying the "bill of review" suit challenging the property settlement. In all likelihood this objection will be under the first subsection of § 502(b), the broadest of the listed grounds, which requires disallowance "to the extent that--(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." Liptak believes that Thornhill's 2001 judgment resulting from the "bill of review" jury verdict is void because of various legal errors, such as the judge's errors in admitting evidence and faulty jury instructions.

## 1. The *Rooker-Feldman* Doctrine Problem

An unanticipated problem, though, is that § 502(b)(1) objections don't occur in a legal vacuum; they are subject to and limited by other legal considerations such as the subject-matter jurisdiction requirements imposed by the *Rooker-Feldman* doctrine.[7] *In re Johnson*, 210 B.R. 1004,

---

[7]In determining whether a petition has been filed in good faith, a Court has some discretion to take a look at considerations that would normally arise for final determination during a later proceeding in the case such as a plan-confirmation hearing, *Matter of Love*, 957 F.2d 1350, 1361 (7th Cir. 1992); *Matter of Woodbrook Associates*, 19

1006 (Bankr. W.D. Tenn. 1997); March, Kathleen P. & Hildebrandt, Jennifer, *The Many Ways to Win or Lose on Your Bankruptcy Issue in State Court; or, Why Bankruptcy Lawyers and Judges Who Thought State Court Was Irrelevant to Bankruptcy Practice Guessed Wrong*, 25 Cal. Bankr. J. 332, 343 (2000). This limitation prevents federal courts of original jurisdiction from having subject matter jurisdiction to act as *de facto* appellate courts for judgments rendered in any state-court system, March, Kathleen P. & Hildebrandt, Jennifer, *The Many Ways to Win or Lose on Your Bankruptcy Issue in State Court; or, Why Bankruptcy Lawyers and Judges Who Thought State Court Was Irrelevant to Bankruptcy Practice Guessed Wrong*, 25 Cal. Bankr. J. 332, 342-43 (2000), and as such, it is a more significant limitation than any of the discretionary abstention doctrines. Under the *Rooker-Feldman* doctrine, federal courts do not have subject-matter jurisdiction to review and potentially reverse any rulings issued by either lower or higher state courts, even if they misconstrue federal law. *See Brown & Root v. Breckenridge*, 211 F.3d 194, 198, 199 (4th Cir. 2000); *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996); *Texaco v. Pennzoil Co.*, 784 F.2d 1133, 1142 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987); *Schmitt v. Schmitt*, 165 F. Supp. 2d 789, 794 (N.D. Ill. 2001), *affirmed*, 324 F.3d 484 (7th Cir. 2003). Furthermore, they do not have the authority to act as *de facto* appellate courts *vis-a-vis* state courts unless expressly authorized by statute (such as the federal *habeas corpus* statute). *Reitnauer v. Texas Exotic Feline Found. (In re Reitnauer)*, 152 F.3d 341, 343-44 (5th Cir. 1998). A federal court acts beyond the scope of authority if the merits of the federal controversy are inextricably tied to the state-court judgment, but it does not do so if the federal litigant presents an independent claim that, if meritorious, would not effectively nullify the state-court judgment. *See Schmitt v. Schmitt*, 324 F.3d 484, 486-87 (7th Cir.

---

F.3d 312, 320 n.9, 322 (7th Cir. 1994), or, in this case, a claim-objection hearing.

2003); *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554-57 (7th Cir. 1999); *Centres v. Town of Brookfield*, 148 F.3d 699, 702 (7th Cir. 1998); *Breckenridge,* 211 F.3d at 198, 200-01; *Harris v. N.Y. State Dep't of Health*, 202 F. Supp.2d 143, 162-63 (S.D.N.Y. 2002). Courts in the Seventh Circuit apply this test by discerning whether the federal claimant's injury was "only complete" once the state court issued a judgment upholding his opponent's conduct or legal rights, and they find themselves without jurisdiction if the injury was "only complete" at that time. *Fayyumi v. City of Hickory Hills*, 18 F. Supp.2d 909, 914-17 (N.D. Ill. 1998).

This test is easily applied to Liptak's challenge to Thornhill's claim in this bankruptcy case, because it is the June 2001 state-court judgment reapportioning their property settlement that is the real source of Lip's primary disputed debt. He would have this Court re-conduct the bill of review proceeding in the form of having it conduct a hearing on his forthcoming claim objection. Thus, Liptak's overriding purpose for this bankruptcy case does not even involve the type of dispute over which this Court has subject-matter jurisdiction. Having the bankruptcy court disallow a claim under § 502(b)(1) because it is unenforceable under nonbankruptcy law is possible if the enforceability issue has not been previously litigated in state-court litigation; otherwise, the bankruptcy court does not have jurisdiction to readjudicate the issue.

The only exceptions to the *Rooker-Feldman* doctrine that would permit a federal court of original jurisdiction to retry a matter from a state-court civil action are explicit statutory ones (such as the *habeas corpus* statute available for relief from criminal confinement) and full-faith-and-credit ones for judgments that are deemed void for lack of personal jurisdiction, subject matter jurisdiction, or the most basic due-process procedures. Liptak contends that Thornhill's judgment is null and

23

void *ab initio* under these exceptions for a variety of reasons that do not implicate any of these

grounds. Errors in the admission of evidence and instruction of a jury, for instance, are mere

nonjurisdictional legal errors on matters over which the 255th Judicial District of Texas had authority

to rule and could only be corrected by direct attack on appeal in the same jurisdiciton rather than by

collateral attack. Personal jurisdiction could not have been a problem for two Texas residents

engaging in litigation in Texas courts. State trial courts such as the 255th Judicial District of Texas

have, with few exceptions, original and general subject matter jurisdiction to hear virtually any type

of civil dispute, including a "bill of review" action that is Texas's chosen method for attacking an

otherwise final judgment on the merits, if specific preliminary showings are established. Liptak also

received a jury trial in which he was entitled to appear and present arguments to the judge and to the

jury that ultimately answered special interrogatory questions in favor of Thornhill. The Court sees

no evidence that would call into question the 255th Judicial District's capacity to function as a court

of law. In Texas, a judgment distributing money pursuant to a divorce decree is not considered void

*ab initio*, as opposed to being voidable on direct appeal, just because the judgment debtor

subsequently alleges that the legal errors giving rise to the judgment are violations of the state due

process clause and various other state constitutional provisions. On the present record, the Court

sees no full-faith-and-credit obstacle to finding that the *Rooker-Feldman* doctrine deprives this Court

of its power to even consider the merits of the eight years of litigation resulting in the June 11, 2001

judgment in the original amount of $1,655.045.

Liptak does present one specific and novel argument challenging the jurisdiction of the 255th

Judicial District of Texas to render this judgment insofar as it reawards the $195,000 from the Showa

Denko lawsuit settlement to Thornhill. He contends that because the 68th Judicial District's

24

dismissal of his and Thornhill's personal injury lawsuit versus Showa Denko awarded a portion of

the settlement money to Thornhill and the remaining $195,000 to Liptak, and because the 255th

Judicial District's judgment on the bill of review reapportioned the property settlement by awarding

the same amount to Thornhill, the latter district improperly assumed jurisdiction to open and revise

the former district's final order of dismissal. It is true that after the passage of 30 days without an

appeal or motion for a new trial, a Texas judgment becomes final, and another trial court's order

subsequently vacating the judgment is void for lack of subject-matter jurisdiction.

Nevertheless, the question of whether the 255th Judicial District of Dallas County actually

vacated, as a matter of law, the 68th Judicial District's 1995 consent judgment is an entirely different

matter. Liptak's situation does not present any significant problem concerning the subject matter

jurisdiction of the 255th District for two related reasons. First, the readjudication of the property

division in the divorce case would redetermine the two parties' legal rights to specific property *vis-a-*

*vis* each other as husband and wife; it would not reopen and redetermine their rights to money

damages *vis-a-vis* Showa Denko, which was the only issue conclusively determined in the settlement

and dismissal from the 68th Judicial District. Since the latter case apparently presented no cross-

claim for decision, the Texas state court could not purport to make a final and unassailable

apportionment of the settlement proceeds between the two parties when their legal liabilities and

rights against one another were not the subject of the lawsuit in the same way that Showa Denko's

were. The 1995 apportionment of the proceeds from the personal injury suit *merely followed* the

percentage stated in the ultimately superceded 1993 property-division in the divorce decree (Liptak

was entitled to 39% of the first $500,000, or $195,000), and the judgment from the 68th Judicial

District did not purport to say that Liptak had an absolute right to the $195,000 against the entire

25

world, only against Showa Denko, the opposing party.

Second, a bill of review was an appropriate procedural device that Thornhill could use to directly attack a judgment that has otherwise become final, such as the property settlement accompanying a divorce decree; furthermore, she used it to attack the only legal basis upon which the 68th Judicial District's 1995 apportionment of settlement proceeds could rely. The 255th District's 2001 judgment in favor of Thornhill cannot be considered a true vacation of the 68th District's apportionment of the personal-injury lawsuit proceeds. A bill of review is an independent equitable suit to reopen a judgment that is no longer appealable if the plaintiff establishes her *prima facie* case showing a deprivation of a claim or defense because the defendant's fraud or breach of fiduciary duty unpaired with the plaintiff's own contributory negligence. Once a divorce case is reopened with the necessary preliminary showings, the division of marital property would be subject to reapportionment in the bill of review proceeding. This is precisely what the 255th Judicial District of Texas did; it may have reached the wrong factual conclusions or interpreted Texas family law incorrectly, but such error would have been "mere legal error on a matter over which it has subject matter jurisdiction." March, Kathleen P. & Hildebrandt, Jennifer, *The Many Ways to Win or Lose on Your Bankruptcy Issue in State Court; or, Why Bankruptcy Lawyers and Judges Who Thought State Court Was Irrelevant to Bankruptcy Practice Guessed Wrong*, 25 Cal. Bankr. J. 332, 340-41 (2000) (citing *In re Pavelich*, 229 B.R. 777, 783 (B.A.P. 9th Cir. 1999)).

### 2. The § 523(a) Exception to Discharge Problem

A further problem with Liptak's primary purpose and direction for this case is that the claim disallowance tactic to be used as his main weapon against Thornhill might not effectively give him the relief he seeks even if he uses it successfully. That is, if this Court disallowed Thornhill's claim

26

under § 502(b)(1) in violation of the *Rooker-Feldman* doctrine, such decision would only affect her right to receive a distribution according to a confirmed reorganization plan distributing Liptak's bankrtupcy estate property or future earnings therefrom. 11 U.S.C. § § 1126(c), 1129, 1141(d). It would not necessarily affect Thornhill's right to ultimately pursue collection of her prepetition debt even if Liptak discharged his debts upon confirmation of a chapter 11 plan, because under either § 523(a)(4) (debts for fraud or breach of fiduciary duty) or § 523(a)(16) (debts for property division in divorce decrees), Thornhill might be able to pursue exceptions to the discharge injunction. 11 U.S.C. § § 523(a), 1141(d). If she were to be successful in such an attempt, this bankruptcy case will have changed very little of the situation existing prepetition, its only result being unnecessary delay in the collection of the debt.

### 3. The Absence of a Corresponding Bankruptcy Code Policy to Offset the Delay and Other Adverse Impacts on Liptak's Creditors' Collection Rights

Aside from the legal hurdles surrounding Liptak's particular bankruptcy tactic against Thornhill, his purposes in filing this case constitute "cause" for dismissal. Even if his tactic of avoiding payment and liability fails for either of the above reasons, his motives and plans for filing this case have resulted in delaying further Thornhill's two-year attempt to realize her state-law rights without implicating a single one of the usual policies that the Bankruptcy Code was designed to further.

For instance, one of the important purposes of bankruptcy law is to preserve the going-concern value of businesses and to treat creditors fairly and even-handedly, thereby making the debtor's creditor body as a whole better off in the long run than it would have been if no bankruptcy case were possible. The nature of this case is such that the benefit is solely for the debtor without

27

any corresponding benefit to the creditor body. Given the extremely small number of creditors here, given that the debtor's main intent is to re-adjudicate and nullify (by means of a claim objection) the primary creditor's money judgment, and given that the debtor actually has liquid assets with which he could satisfy his obligations, the Court can scarcely discern any way in which this case would put the creditor body in a better position than it would have been in had bankruptcy relief not been possible; it will only delay them. Further, this is not a case that implicates one of the other primary creditor-oriented purposes of the Bankruptcy Code: the fair and ratable distribution of a debtor's assets to the creditor body. That concern is only implicated when, unlike here, insufficient assets exist to pay all claims, thereby presenting a danger that similarly situated creditors would receive unequal percentage recoveries on their claims if no bankruptcy intervention occurred.

The irony of Liptak's using a bankruptcy case in this situation is that because he is a chapter 11 debtor-in-possession, he has a fiduciary obligation to his creditor body, which in this instance is composed primarily of his ex-wife Thornhill. His fiduciary obligation is to his ex-wife when all of his efforts at reorganization are aimed at paying her as little as possible rather than at maximizing the dividend that the bankruptcy estate will pay her and Bourland Kirkman.[8] The likelihood that Congress intended that the special debtor-as-trustee provisions of chapter 11 should be used as a weapon to gain leverage in battling one's ex-spouse in bitterly contested post-property-settlement litigation is zero. If this case were not dismissed, Liptak's inability to perform his fiduciary obligation to Thornhill in this case would likely require the appointment of a chapter 11 trustee or the conversion of the case to a chapter 7 case with a chapter 7 trustee, and either such trustee would

---

[8]Because Liptak is in fact solvent and has access to liquid assets, he could simply pay his $10,872 debt to Bourland Kirkman rather than using the more complex Bankruptcy Code to marshal, sell, and distribute assets of the bankruptcy estate for the purpose of maximizing such creditor's dividend.

28

simply use the liquid assets available here as part of the bankruptcy estate to pay Thornhill's claim

in spite of any claim objection, as the *Rooker-Feldman* doctrine would probably require. A Chapter

11 reorganization case in federal court is not the proper way to proceed with what is essentially an

adjudicated two-party dispute, and especially not when that dispute is the product of a

noncommercial transaction such as a property settlement.

### C. The Existence of "Cause" for Dismissal with Prejudice

The Court has concluded that "cause" for dismissal under § 1112(b) has been established

because Liptak did not file this case in good faith. This type of "cause" for dismissal also happens

to establish "cause" for dismissal with a bar to refiling a bankruptcy case under § 349(a), *see In re*

*Leavitt*, 209 B.R. 935, 939 (B.A.P. 9th Cir. 1997), *affirmed*, 171 F.3d 1219 (9th Cir. 1999); *In re*

*Hall*, 304 F.3d 743, 746 (7th Cir. 2002), because Liptak's behavior shows a tendency toward taking

his contentions and interpretations of law rejected by one court and then recycling and re-presenting

them to another court (in either the state or federal system) that does not have appellate jurisdiction

over the rulings over which he complains. A one-year bar would be appropriate here to ensure that

pending garnishment proceedings may proceed unabated by additional automatic stays.

### D. The Pendency of Liptak's Adversary Proceeding Against Thornhill and the Required Nexus to a Pending Bankruptcy Case

Still pending is Liptak's Adversary Proceeding # 03-03732 against Thornhill. The only

reason a U.S. bankruptcy court has subject matter jurisdiction over any adversary proceeding at

all is because of its nexus to the underlying bankruptcy case pursuant to 28 U.S.C. § § 157 and

1334. Therefore, the general rule is that a court's dismissal of a bankruptcy case should result in

the dismissal of each related adversary proceeding by separate order, because "federal

29

jurisdiction is premised upon the nexus between the underlying bankruptcy case and the related

proceedings." *Fidelity & Deposit Co. of Md. v. Morris (In re Morris)*, 950 F.2d 1531, 1534-35

(11th Cir. 1992); *see In re Statistical Tabulating Corp.*, 60 F.3d 1286, 1289 (7th Cir. 1995); *Helms*

*v. Arboleda (In re Arboleda)*, 224 B.R. 640, 647 (Bankr. N.D. Ill. 1998). The judicial-economy

exception to this general rule giving a bankruptcy court discretion to retain jurisdiction,

*Statistical Tabulating*, 60 F.3d at 1289; *Morris*, 950 F.2d at 1535; *Arboleda*, 224 B.R. at 647, is

not implicated in the present situation because this Court has not proceeded to adjudicate or try

the adversary proceeding in any fashion, even though cross motions for dismissal and for partial

summary judgment are currently pending. The dismissal of Liptak's underlying bankruptcy case

under § 1112(b), then, requires dismissal of the adversary proceeding for lack of subject matter

jurisdiction pursuant to Bankruptcy Rule 7012(h)(3), because the resolution of the controversy

would in no way impact the rights and duties of this debtor-creditor pair under the U.S.

Bankruptcy Code.

The foregoing opinion constitutes findings of fact and conclusion of law pursuant to

Bankruptcy Rules 9014 and 7052. A separate order under Bankruptcy Rule 9021 will follow.

### ORDER

Having read the motion filed in this matter, having received and examined the

memoranda of law submitted by the parties in support of their respective positions, having heard

the arguments of counsel, and having been fully advised in the premises,

the Court hereby finds as follows:

1.     Bankruptcy Case 03-29854 is dismissed for "cause" under 11 U.S.C. § 1112(b).

2.     Chapter 11 debtor Virgil Liptak is barred from refiling another bankruptcy case anywhere

30

in the United States for a period of one year from the date of the entry of this order.

3.      Adversary Proceeding # 03-03732 is dismissed for lack of subject matter jurisdiction.

Date:   January 6, 2004                              ENTERED:

_____

Jacqueline P. Cox
United States Bankruptcy Judge